IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

ANTON WILLIAMS,

Defendant

Criminal No.: ELH-19-0286

**MEMORANDUM OPINION**

Defendant Anton Williams was one of 25 defendants in a drug trafficking case.  He entered a plea of guilty on June 1, 2021, to the offenses of conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §846; possession with intent to distribute fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B); and money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). ECF 1135. The plea was tendered pursuant to a Plea Agreement.  ECF 1137.  Under Fed. R. Crim. P. 11(c)(1)(C), the parties agreed to a total sentence of 120 months of incarceration.  *Id.* ¶ 9.  At sentencing on September 10, 2021 (ECF 1274), the Court imposed the agreed upon sentence, with credit for time served since May 22, 2019. ECF 1275 (Judgment).

Williams, who is now self-represented, has filed a motion for compassionate release, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).  ECF 1322 (the "Motion"). The Motion is supported by sixteen exhibits (1322-1 to ECF 1322-16), as well as multiple supplements. ECF 1323; ECF 1327; ECF 1330; ECF 1332; ECF 1342. The government opposes the Motion (ECF 1345, the

"Opposition"), and has submitted several exhibits.  ECF 1345-1 to ECF 1345-3. Defendant has replied. ECF 1358. Williams has also filed a motion for appointment of counsel. ECF 1326. [1]

No hearing is necessary to resolve the motions.  *See* Local Rule 105.6.  For the reasons that follow, I shall deny the Motion, as well as the motion for counsel.[2]

## I.  Background

Williams and twenty-four others were charged in a Superseding Indictment on June 25, 2019. ECF 96. In particular, Williams was charged with the offenses of conspiracy to distribute and possess with intent to distribute one kilogram or more of heroin, five kilograms or more of cocaine, 280 grams or more of cocaine base, and fentanyl, in violation of 21 U.S.C. § 846 (Count One); possession with intent to distribute fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B) (Count Twenty-Seven); possession of a firearm in furtherance of drug trafficking, in violation of 18 U.S.C. §924(c) (Count Twenty-Eight); possession of a firearm and ammunition by a convicted felon, in violation of 18 U.S.C. §922(g)(1) (Count Twenty-Nine); and money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) (Count Thirty). ECF 1135. Count Twenty-Eight references Count One as the drug trafficking crime. A Second Superseding Indictment was filed on April 21, 2021.  ECF 1031.  The offense of possession with intent to distribute became Count Twelve.  The § 924(c) offense was moved to Count Thirteen.  Count Fourteen charged the offense of felon in possession. And, Count Fifteen charged the money laundering offense. The conspiracy offense remained as Count One.

---

[1] The Office of the Federal Public Defender has provided notice to the Court that it will not represent defendant or seek to supplement the defendant's Motion.  ECF 1333.

[2] Williams and the government are also embroiled in a dispute as to forfeiture.  That dispute will be addressed in a separate opinion.

Pursuant to a Plea Agreement (ECF 1137), Williams entered a plea of guilty on April 19, 2021, to Counts One, Twenty-Seven, and Thirty of the Superseding Indictment. ECF 1135.  Count One carried a mandatory minimum term of imprisonment of 120 months (ten years), with a maximum of life imprisonment.  ECF 1137, ¶ 3.  As noted, under Fed. R. Crim. P. 11(c)(1)(C) ("C Plea"), the parties agreed to a total sentence of incarceration of 120 months as the appropriate disposition. *Id.* ¶ 9.

In the Plea Agreement, the parties stipulated to the following facts, *id.* at 11-12:

> Beginning in July 2018, or earlier, the defendant, Anton Williams ("Williams") engaged in a conspiracy to distribute controlled substances, including fentanyl, heroin and cocaine in Baltimore City, Maryland. The defendant agreed with the various coconspirators to acquire these controlled substances and to assist in distributing those controlled substances to other persons.

> In or about July of 2018, Drug Enforcement Administration ("DEA"), Strike Force Group 1 ("SF1") began an investigation of the Monument Street corridor in East Baltimore. Law enforcement knows this area supports a high-volume of street-level drug distribution and attendant acts of violence associated with the drug trafficking. As part of the investigation, the DEA obtained authority to intercept the wire and electronic communications of several individuals from that area. Additionally, investigators conducted controlled purchases of narcotics in the area utilizing confidential informants and undercover Baltimore City Police ("BPD") officers. These undercover purchases identified multiple street-level drug trafficking "shops" with the two most prominent located in the 400 block of North Montford Avenue at Jefferson Street ("the Montford DTO") and in the 2400 block of East Monument Street at Port Street (the "Out the Mud", or "OTM DTO"). These purchases also identified the drugs shops' sources of supply of narcotics.

> During the investigation, investigators identified Williams as a source of supply of controlled substances to co-conspirators. Additionally, investigators intercepted calls between Williams and co-conspirators discussing the distribution of controlled substances including cocaine, heroin and fentanyl. Throughout the course of his involvement, it was reasonably foreseeable to Williams, and within the scope of the conspiracy that he or other members of the conspiracy would distribute more than 5 kilograms of cocaine as well as quantities of cocaine, heroin and fentanyl during the course of and in furtherance of the conspiracy. The total proceeds obtained by Williams from supplying controlled substances to co-conspirators was at least $472,000.

Williams participated in the activities of the conspiracy in the District of Maryland. Some examples of Williams' participation in the conspiracy include, but are not limited to:

- On May 22, 2019, investigators executed a search and seizure warrant at 3601 Clarks Lane, Apartment 522, Baltimore, Maryland, believed to be Williams' residence. Pursuant to the search investigators recovered a firearm, a money counter, 10 cell phones including two of the intercepted phones belonging to Williams. Additionally, investigators recovered a total of $206,444 as well as one money counter. The money is believed to be drug proceeds.

- Investigators also searched two vehicles used by Williams: a 2014 Toyota Venza bearing Maryland registration 56950CH, and a 2018 Lexus LC 500 coupe VIN JTHHP5AY6JA001741. Investigators recovered paperwork in Williams name in each vehicle and recovered multiple bags of suspected cocaine and heroin, as well as 76 grams of a substance that was tested and found to be fentanyl from the Toyota. The defendant admits that he possessed the fentanyl with the intent to distribute it for sale.

- Williams engaged in multiple phone calls and other electronic communications with other members of the conspiracy during which they discussed narcotic transactions. Investigators monitored the communications during court-authorized wiretap monitoring on cellular phones used by other members of the conspiracy.

- During the course of the investigation, investigators discovered that Williams had acquired multiple properties, to include Rosie's Bar, located at 482 S. Bentalou Street, Baltimore, Maryland, where Williams met with co-conspirators. Williams used limited liability companies ("LLC"), associates or family members to purchase the properties to conceal the ownership of the various properties as well as to conceal the financial nature and circumstances of the purchased properties. Investigators intercepted calls between Williams and a hard money lender discussing the payment for Rosie's Bar. Based on the intercepted conversations, investigators believe Williams purchased the Bar with drug trafficking proceeds. Additionally, Williams conspired with co-conspirators to use this location to meet with drug customers for the purposes of collecting money and providing controlled substances to them. Several other properties were identified during the course of the investigation that are believed to be purchased with drug trafficking money. Investigators identified the following addresses that Williams either owned or is leased:

- 7 South Bernice Avenue, Baltimore, Maryland, 21229
- 707 Wilbron Avenue, Baltimore, Maryland, 21216
- 2850 Woodbrook Avenue, Baltimore, Maryland, 21217
- 120 Collins Avenue, Baltimore, Maryland, 21229
- 3303 Winterbourne, Baltimore, Maryland, 21216
- 3601 Clarks Lane, Apt 522, Baltimore, Maryland 21215
- 482 S. Bentalou Street, Baltimore, Maryland 21223

- Investigators recovered a total of $363,233 from various bank accounts associated with Williams. The money is believed to be drug proceeds. At this time, according to the government, Williams is not known to have a job and therefore all of these properties and seized money is believed to be purchased with drug proceeds

- To the extent that any portion or share of an above-listed property or asset is not traceable to drug proceeds and/or used to facilitate the commission of the offenses to which Williams pleads guilty, that portion or share is nevertheless subject to forfeiture as substitute property in lieu of drug proceeds that, as a result of Williams's actions: cannot be located upon the exercise of due diligence; have been transferred or sold to, or deposited with, a third party; have been placed beyond the jurisdiction of the Court; have been substantially diminished in value; or have been commingled with other property which cannot be divided without difficulty.

Pursuant to the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G."), the Plea Agreement anticipated an adjusted base offense level of 30, before deductions for acceptance of responsibility. ECF 1137, ¶ 6(d). The parties anticipated three deductions for acceptance of responsibility, pursuant to U.S.S.G. §§3E1.1(a), (b). ECF 1137, ¶ 6(e). Thus, the parties anticipated a final offense level of 27. *Id.* The Presentence Report ("PSR", ECF 1240) was consistent with the Plea Agreement as to Williams's final offense level. *Id.* ¶¶ 16-25.

The Plea Agreement also anticipated a criminal history score of three points and a criminal history category of III. ECF 1137, ¶ 7. The Presentence Report was consistent with the Plea Agreement. *See* ECF 1240, ¶ 38.

Sentencing was held on September 10, 2021. ECF 1274. At that time, Williams was forty-five years of age. *See* ECF 1240 at 3. With a final offense level of 27 and a criminal history

5

category of III, the Guidelines called for a period of imprisonment ranging from 87 months to 108 months of imprisonment. ECF 1240, ¶ 103. But, the mandatory minimum sentence of 120 months exceeded the Guidelines range.  Therefore, the Guidelines term of imprisonment was adjusted to 120 months, pursuant to U.S.S.G. §5G1.2(b). *See* ECF 1240, ¶¶  102, 103. The Guidelines were consistent with the sentence agreed upon by the parties (ECF 1137, ¶ 9) and imposed by the Court. ECF 1240.

Williams is currently serving his sentence at Fort Dix FCI. To date, he has served approximately 50% of his sentence.  He has a projected release date of March 2, 2027. *See Find an inmate*, Federal Bureau of Prisons,  https://www.bop.gov/inmateloc/ (last accessed June 6, 2023).

Williams filed a petition for compassionate release with the Warden on November 30, 2021. ECF 1323. The  Warden failed to respond. ECF 1345 at 1.Because 30 days have lapsed since defendant sought relief through the Warden, the government agrees that Williams has exhausted his administrative remedies. *Id.*  The Motion followed in January 2022, just months after the defendant was sentenced for his commission of several serious offenses.

Williams contracted COVID-19 in the Fall of 2020.  ECF 1358 at 9.  Fortunately, it does not appear that he experienced significant illness.  ECF 1345 at 31.  Nonetheless, he seeks compassionate release based on three underlying medical conditions that he claims would enhance the risk of serious illness if he were again to contract COVID-19.

In particular, defendant cites his obesity; asthma; and a heart condition.  ECF 1322 at 5. He notes that he has a body mass index ("BMI") of 30.  *Id.* at 6.  And, he also claims that his "place of confinement" puts him "at a particularized risk of re-infection."  *Id.* at 5.  Moreover, defendant

complains that "the BOP simply does not take inmate health and protection from this 'very serious virus' <u>that seriously</u>. . . ." ECF 1358 at 9.

Defendant acknowledges that he has declined to be vaccinated for COVID-19. ECF 1345 at 22. He explains that he "has made what he feels is an informed choice not to receive any of the currently available vaccines." ECF 1358 at 9. Williams points to the "rush to get a vaccine to market and the fact that Congress felt the need to provide a liability shield to vaccine manufacturers," which has "made him suspicious of all vaccines being used under Emergency Use Authorization." *Id.* at 9-10.

The government concedes that defendant has medical conditions that can qualify as extraordinary and compelling reasons for compassionate release. ECF 1345 at 19. It points to defendant's obesity and asthma, *id.* at 21, but notes that his BMI is only around 29.5, and therefore defendant is not "severely obese." *Id.* at 21. The government also disputes defendant's diagnosis of a heart condition. *Id.* at 3.

In arguing against compassionate release, the government points to the defendant's election to "forgo an opportunity to provide self-care against serious injury or death" by refusing to be vaccinated. *Id.* at 22. Further, the government asserts that the defendant cannot show a justification for compassionate release "because his medical conditions are being treated in BOP custody." *Id.* at 3. Moreover, the government maintains that compassionate release is not warranted in light of the factors under 18 U.S.C. § 3553(a).

In his reply, defendant insists that BOP's medical records clearly support the diagnosis of a heart ailment. ECF 1358 at 2. He points to medical records from an earlier incarceration as well as more recent records. He also indicates that his medical records show he has substance use disorders and is a former smoker, both of which are COVID-19 risk factors. ECF 1358 at 11.

In addition, defendant asserts that, as an African American male, he is more likely to be hospitalized and to die from COVID-19, as compared to a "Caucasian male." ECF 1358 at 11. He asks the Court to consider his age, his non-violent history, his disciplinary record, and other factors. *Id.*

Additional facts are discussed, *infra*.

## II.   Appointment of Counsel

Williams asks the Court to appoint counsel for him. ECF 1326. But, there is no constitutional right to appointed counsel in this proceeding. *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987) ("The right to appointed counsel extends to the first appeal of right, and no further."). Rather, the determination to appoint counsel rests solely within the discretion of the district court. *See United States v. Legree*, 205 F.3d 724, 730 (4th Cir. 2000) (explaining that a district court has the discretion to appoint defendant counsel under 18 U.S.C. § 3582(c) in exceptional circumstances).

Williams has ably demonstrated the ability to articulate the legal and factual basis for his Motion. And, a review of defendant's case does not reveal any unusual or exceptional circumstances that would warrant the appointment of counsel.

Therefore, I shall deny defendant's request for appointment of counsel, without prejudice.

## III.   Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Malone*, 57 F.4th 167, 173 (4th Cir. 2023); *United States v. Bond*, 56 F. 4th 381, 383 (4th Cir. 2023); *United States v. Bethea*, 54 F.4th 826, 831 (4th Cir. 2022); *United States v. Ferguson,* 55 F.4th 262, 267 (4th Cir. 2022); *United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022); *United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020);

*United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019). But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011). One such exception is when the modification is "expressly permitted by statute." 18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Congress "broadened" the authority of the courts in 2018, with passage of the First Step Act ("FSA"), Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018) (codified as 18 U.S.C. § 3582(c)(1)(A)). *Malone*, 57 F.4th at 173. Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction." *Hargrove*, 30 F.4th at 194. This provision is an exception to the ordinary rule of finality in regard to a federal sentence. *United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021).

Section 3582 was first enacted as part of the Sentencing Reform Act of 1984. Originally, it permitted a court to alter a sentence only upon a motion by the Director of the BOP. *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief. *See Bethea*, 54 F.4th at 831; *see*, *e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

For many years, the safety valve of § 3582 languished. The BOP rarely filed motions on an inmate's behalf. As a result, compassionate release was exceedingly rare. *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

As a result of the enactment of the FSA in December 2018, a federal inmate is now permitted to file a motion for compassionate release directly with the court after exhaustion of administrative remedies.  *See United States v. McCoy*, 981 F.3d 271, 275-76 (4th Cir. 2020). Specifically, pursuant to the 2018 FSA, the Court may reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.  (Emphasis added).  *Id.*

Once a defendant has exhausted his administrative remedies, or after 30 days have passed from the date on which the warden has received the defendant's request, the defendant may petition a court directly for compassionate release.  *Ferguson*, 55 F.4th at 268; *Jenkins*, 22 F.4th at 169; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276.  This constituted a sea change in the law.

But, under 18 U.S.C. § 3582(c)(1)(A), the court may modify the defendant's sentence only if two criteria are met.  *Bethea*, 54 F.4th at 831.  In other words, the analysis consists of "two steps."  *Bond*, 56 F.4th at 383.  And, for a court to award compassionate release, it must conclude that the movant satisfies both criteria.  *Bethea*, 54 F. 4th at 831; *see Hargrove*, 30 F.4th at 194-95.

"First, the court must determine the prisoner is eligible for a sentence reduction because he has shown 'extraordinary and compelling reasons' supporting relief."  *Bethea*, 54 F.4th at 831 (citation omitted); *see also Bond*, 56 F.4th at 383; *United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam), *cert. denied*, ___ U.S. ___, 142 S. Ct. 383 (2021).  If that criteria is met, the court "must then find that release is appropriate under the 18 U.S.C. § 3553(a) sentencing factors, to the extent those factors are applicable."  *Bethea*, 54 F.4th at 831; *see also Malone*, 57

F.4th at 174; *Hargrove*, 30 F.4th at 194; *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021); *Kibble*, 992 F.3d at 330.

Generally, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis." *Jenkins*, 22 F.4th at 169. But, the Fourth Circuit has said: "When deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)).

In U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might merit compassionate release. *See McCoy,* 981 F.3d at 276-77.[3] In particular, U.S.S.G. § 1B1.13 provides that on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 are expansive and indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons." U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1(D), titled "Other Reasons," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an

---

[3] The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"), as well as 28 U.S.C. § 994(a)(2)(C). *See McCoy,* 981 F.3d at 276.

extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."  U.S.S.G. § 1B1.13 App. Note 1(D).  This is the "so-called, 'catch-all' category."  *McCoy*, 981 F.3d at 276.

However, as the Fourth Circuit has recognized, there is no applicable policy statement for a motion filed by a defendant under § 3582(c)(1)(A).  *See, e.g., Malone*, 57 F.4th at 174; *McCoy*, 981 F.3d at 276.  Of significance here, the policy statement in U.S.S.G. § 1B1.13 was issued in 2006 and was last updated in November 2018, *prior* to the enactment of the FSA.  It is *only* "directed at BOP requests for sentence reductions."  *McCoy*, 981 F.3d at 276 (citing U.S.S.G. § 1B1.13).  Thus, "[b]y its plain terms. . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)."  *McCoy*, 981 F.3d at 282; *see also Jenkins*, 22 F.4th at 169; *United States v. Brooker,* 976 F.3d 228, 235-36 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1100-02 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020).

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276.  And, because there is currently no Sentencing Commission policy statement applicable to a defendant's compassionate release motion, "district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to [U.S.S.G.] § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction."  *McCoy*, 981 F.3d at 283; *see also Hargrove*, 30 F.4th at 194-95; *United States v. Brice*, 2022 WL 3715086, at *1 (4th Cir. Aug. 29, 2022) (per curiam).  Although there are currently no applicable policy statements for the Sentencing Commission that are applicable to compassionate release., U.S.S.G. § 1B1.13 "remains helpful guidance . . . ." *McCoy*, 981 F.3d at 282 n.7; *see Hargrove*, 30 F.4th at 194.  Consequently, district courts are "'empowered . . . to consider any extraordinary and compelling reason for release that

12

a defendant might raise.'" *McCoy*, 981 F.3d at 284 (citation omitted); *see also Jenkins*, 22 F.4th at 170.

"The factors applicable to the determination of what circumstances can constitute an extraordinary and compelling reason for release from prison are complex and not easily summarized." *Hargrove*, 30 F.4th at 197. But, "successful rehabilitation efforts can be considered" in regard to the analysis of extraordinary and compelling reasons. *United States v. Harris*, 2022 WL 636627, at *1 (4th Cir. Mar. 4, 2022) (per curiam); *see United States v. Gutierrez*, ___ Fed. App'x ___, 2023 WL 245001, at *4 (4th Cir. Jan. 18, 2023) (stating that, in considering a compassionate release motion, the district court erred by failing to address the defendant's evidence of rehabilitation). Nevertheless, "rehabilitation alone cannot serve as a basis for compassionate release." *United States v. Davis*, 2022 WL 127900, at *1 (4th Cir. Jan. 13, 2022) (per curiam); *see McCoy*, 981 F.3d at 286 n.9; *Harris*, 2022 WL 636627, at *1; 28 U.S.C. § 994(t). Moreover, "[i]n deciding a motion for compassionate release, the district court is confined to the evidence presented." *Bethea*, 54 F.4th at 833 n.2; *see also United States v. Osman*, 2022 WL 485183, at *1 (4th Cir. Feb. 17, 2022).

The Guidelines "are not directly applicable to defendant-filed motions" under § 3582(c). *Jenkins*, 22 F.4th at 169. However, "the court may consider these guidelines in defining what should be considered an 'extraordinary and compelling circumstance' warranting a sentence reduction." *Id.* (citing U.S.S.G. § 1B1.13); *see High*, 997 F.3d at 187.

Of relevance here, the Supreme Court decided *Concepcion v. United States*, ___ U.S. ___, 142 S. Ct. 2389 (2022), on June 27, 2022. In that case, the Supreme Court said, in the context of § 404(b) of the First Step Act, that "a district court cannot . . . recalculate a movant's benchmark Guidelines range in any way other than to reflect the retroactive application of the Fair Sentencing

Act [of 2010] . . . ." *Id.* at 2402 n.6.  The Court explained that the "Guidelines range 'anchor[s]' the sentencing proceeding . . . .  The district court may then consider postsentencing conduct or nonretroactive changes . . . with the properly calculated Guidelines range as the benchmark."  *Id.* (first alteration in original; internal citation omitted); *see also United States v. Troy*, 64 F.4th 177, 183-84 (4th Cir. 2023).

To be sure, the district court is obligated to consider all non-frivolous arguments for sentence reduction based on intervening changes in the law and factual developments. *Concepcion*, 142 S. Ct. at 2396; *Troy,* 64 F.4th at 184; *United States v. Reed*, 58 F.4th 816, 822 (4th Cir. 2023); *Brice*, 2022 WL 3715086, at *2.  However, such changes do not warrant a recalculation of the Guidelines.  *Troy,* 64 F.4th at 184.

The defendant, as the movant, bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582.  *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, 451 F. Supp. 3d 562, 565 (W.D. Va. 2020).  And, compassionate release is a "rare" remedy.  *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019); *see Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020).

As explained, even if the defendant establishes an extraordinary and compelling reason that renders him eligible for a sentence reduction, that does not end the inquiry.  The second step requires the court to consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate.  *See Dillon v. United States*, 560 U.S. 817, 826-27 (2010); *United States v. Mangarella*, 57 F.4th 197, 200, 203 (4th Cir. 2023); *Malone*, 57 F.4th at 174; *Bethea*, 54 F.4th at 833; *Hargrove*, 30 F.4th at 195; *High*, 997 F.3d at 186; *Martin*, 916 F.3d at 397; *see also United States v. Jones*, 2022 WL 2303960, at *1 (4th Cir. June 27, 2022) (per

curiam) (noting that "a court need not explicitly make findings on extraordinary and compelling reasons where consideration of the § 3553(a) factors counsels against release"); *United States v. Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion); *Kibble*, 992 F.3d at 329-30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020) (district court must give due consideration to the § 3553(a) factors).

As the Fourth Circuit has observed "'many case-specific facts fit under the broad umbrella of the Section 3553(a) factors.'" *Bond*, 56 F.4th at 384 (quoting *United States v. Jackson*, 952 F.3d 492, 500 (4th Cir. 2020)). And, in weighing the § 3553(a) factors, the court may consider the terms of a plea bargain. *Bond*, 56 F.4th at 384-85.

Of relevance, "[a] district court need not provide an exhaustive explanation analyzing every § 3553(a) factor," nor is it "required to address each of a defendant's arguments when it considers a motion for compassionate release." *Jenkins*, 22 F.4th at 170; *see Chavez-Mena v. United States*, ___ U.S. ___, 138 S. Ct. 1959 (2018); *High*, 997 F.3d at 187. But, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law." *High*, 997 F.3d at 187 (internal quotation marks omitted); *see Jenkins*, 22 F.4th at 167. And, "'the record as a whole'" must demonstrate that the judge

15

considered the parties' contentions, and had "'a reasoned basis'" for the exercise of his or her discretion. *Malone*, 57 F.4th at 176 (citations omitted); *see also United States v. Puzey*, 2023 WL 2985127, at *2 (4th Cir. Apr. 18, 2023) (per curiam).

Moreover, where appropriate, the district court "must account not only for the circumstances at the time of the original offense but also for significant post-sentencing developments." *Mangarella*, 57 F.4th at 203; *see Martin*, 916 F.3d at 397; *Kibble*, 992 F.3d at 334 n. 3. That said, "[h]ow much explanation is 'enough' depends on the complexity of a given case." *Gutierrez*, 2023 WL 245001, at *3; *see United States v. McDonald*, 986 F.3d 402, 412 (4th Cir. 2021).

Notably, "it weighs against an abuse of discretion—and is viewed as 'significant'—when the same judge who sentenced the defendant rules on the compassionate release motion." *Bethea*, 54 F.4th at 834; *see Gutierrez*, 2023 WL 245001, at *5; *Hargrove*, 30 F.4th at 200; *High*, 997 F.3d at 189. Moreover, "the district court is less likely to have abused its discretion if it considered arguments in opposition to its ultimate decision." *Bethea*, 54 F.4th at 834; *see also High*, 997 F.3d at 189; *Kibble*, 992 F.3d at 332.

In any event, "the court must provide an explanation sufficient 'to allow for meaningful appellate review' in light of the particular circumstances of the case." *United States v. Cohen*, 2022 WL 2314300, at *1 (4th Cir. June 28, 2022) (per curiam) (quoting *High*, 997 F.3d at 190). And, "when a defendant 'present[s] a significant amount of post-sentencing mitigation evidence, . . . a more robust and detailed explanation [is] required.'" *Cohen*, 2022 WL 2314302, at *1 (quoting *High*, 997 F.3d at 190) (alterations in *Cohen*). In doing so, "a district court is permitted to add to its original, sentencing-phase consideration of the § 3553(a) factors when explaining its compassionate release ruling." *Bethea*, 54 F.4th at 834; *see Kibble*, 992 F.3d at 332.

16

## IV. COVID-19[4]

### A.

The World Health Organization declared COVID-19 a global pandemic on March 11, 2020. *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[5]  Two days later, on March 13, 2020, President Trump declared a national emergency concerning the COVID-19 pandemic. *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19),* TRUMP WHITE HOUSE (Mar. 13, 2020), https://trumpwhitehouse.archives.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.  That declaration was extended on several occasions. *See*, *e.g.*, 88 Fed. Reg. 9385 (Feb. 10, 2023).

COVID-19 spawned "a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020), *aff'd in part, dismissed in part*, 2022 WL 1449180 (4th Cir. May 9, 2022) (per curiam).  People who are stricken with the coronavirus sometimes experience only mild or moderate symptoms.  But, particularly at the outset of the pandemic, the virus could cause severe medical problems as well as death, especially for those in "high-risk categories . . . ."  *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).

On May 11, 2022, the United States "reached more than 1 million COVID-19 deaths, according to a Reuters tally, crossing a once-unthinkable milestone about two years after the first

---

[4] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201.

[5] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

cases upended everyday life."  Trevor Hunnicutt & Jeff Mason, *Biden marks one million U.S.*
*COVID deaths after losing political battles*, REUTERS (May 12, 2022),
https://www.reuters.com/world/us/biden-marks-1-million-americans-dead-covid-2022-05-12/.
And, as of March 10, 2023, COVID-19 has infected more than 103.8 million Americans.  *See*
*COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://bit.ly/2WD4XU9 (last accessed Apr.
20, 2023).

The judges of this Court "have written extensively about the pandemic."  *United States v.*
*Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases).
Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the
pandemic.  *Id.*  That said, the Court must reiterate that the COVID-19 pandemic has been described
as the worst public health crisis that the world has experienced since 1918.  *See United States v.*
*Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents
a clear and present danger to free society for reasons that need no elaboration.").

For a significant period of time, life as we have known it came to a halt.  For quite some
time, businesses and schools were shuttered or operated on a limited basis, in an effort to thwart
the spread of the virus, which is highly contagious.  *See Coronavirus Disease 2019 (COVID-19),*
*How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (August 11, 2022),
https://bit.ly/2XoiDDh.  The judiciary, too, faced many operational challenges.  Indeed, the
pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as
we have known it."  *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich.
May 21, 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020).

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified
certain risk factors that may increase the chance of severe illness due to the coronavirus, and the

CDC has repeatedly revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19.  In February 2023, the CDC updated its guidance to reflect the most available data.  *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (February 10, 2023), https://bit.ly/38S4NfY.

According to the CDC, the factors that increase the risk of severe illness include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities, such as Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathies, and possibly hypertension; HIV; being immunocompromised; liver disease; obesity, where the BMI is 25 or higher; physical inactivity; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis.  *People with Certain Medical Conditions*, *supra*, https://bit.ly/38S4NfY.

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk.  *See COVID-19 Risks and Information for Older Adults*, CTRS. FOR DISEASE CONTROL & PREVENTION (Feb. 22, 2023), https://www.cdc.gov/aging/covid19/index.html.  Furthermore, "[t]he risk of severe illness from COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*, https://bit.ly/38S4NfY.

As to the CDC's risk factors, in the context of a motion for compassionate release, the Fourth Circuit has said that "use of a bright-line rule that accepts only the CDC's highest risk conditions is too restrictive." *Hargrove*, 30 F.4th at 195.  In other words, there is no bright-line

rule predicated only on the CDC's identification of certain health conditions in the "highest risk category." *Id.* at 196.   Nevertheless, the court may consider the CDC's guidelines.   *Bethea*, 54 F.4th at 832; *United States v. Petway*, 2022 WL 168577, at *3 (4th Cir. Jan. 19, 2022) (per curiam). And, "the inquiry should consider whether the underlying condition places the inmate at an increased risk of severe illness from Covid-19."   *Bethea*, 54 F.4th at 832.

### B.

At the outset of the pandemic, in an effort to stem the spread of the virus, people were urged to practice "social distancing" and to wear masks.  *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CENTERS FOR DISEASE CONTROL & PREVENTION (Jan. 26, 2023), https://bit.ly/3dPA8Ba (last accessed Apr. 20, 2023).   However, social distancing is particularly difficult in the penal setting.  *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area.").   Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus.  *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high.").   Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others.   Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020).   And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe*,' WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread. *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. As the Third Circuit recognized in *United States v. Raia*, 954 F.3d

594, 597 (3d Cir. 2020), the BOP made "extensive and professional efforts to curtail the virus's spread."[6]

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 experienced by inmates and employees of the BOP. The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction. *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

On March 26, 2020, then Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19. *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020). And, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281. In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney

---

[6] In June 2020, the *New York Times* reported that cases of COVID-19 had "soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; On October 29, 2020, the *New York Times* reported that "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19. *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020). On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems.*" America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

On April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

General.  *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, then Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ."  *Hallinan*, 2020 WL 3105094, at *9.  That memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ."  *Id.*

Two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum on May 8, 2020, to implement the Attorney General's directives on the increased use of home confinement.  The memorandum provided that the BOP was prioritizing the review of inmates for home confinement, as to inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

## C.

Unfortunately, there is no cure for the coronavirus.  But, medical treatments have continued to improve.  And, significantly, we have seen the rollout of four vaccines for COVID-19 (Pfizer, Moderna, Johnson & Johnson, and Novavax).  *See* Rebecca Robbins and Carl Zimmer, *A fourth COVID vaccine is cleared for use in the United States.*, N.Y. TIMES (July 20, 2022), https://www.nytimes.com/2022/07/19/health/cdc-novavax-covid-vaccine.html.  Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first responders.  But, the criteria for eligibility has since been approved for all persons six months of age and older.  *See* Rhitu Chatterjee, *CDC clears the way for vaccinations for children 6 months to 5 years old*, NPR (June 18, 2022), https://www.npr.org/sections/health-shots/2022/06/18/1105929247/vaccinations-for-children-6-months-to-5-years-old-can-begin-after-cdc-clears-the.

On March 29, 2022, federal regulators approved a second and third booster dose for individuals age 50 and older as well as those at higher risk.  *See* Cheyenne Haslett and Eric M. Strauss, *Officials say everyone over 50 can get a 4th COVID shot, but 'especially important' for higher risk people*, ABC NEWS (Mar. 29, 2022), https://abcnews.go.com/Health/4th-covid-shot-authorized-fda-50/story?id=83730999.   Additionally, on September 1, 2022, the CDC recommended updated COVID-19 boosters from Pfizer-BioNTech for people ages 12 years and older and from Moderna for people ages 18 years and older.  *CDC Recommends the First Updated COVID-19 Booster*, CTRS. FOR DISEASE CONTROL (Sept. 1, 2022), https://www.cdc.gov/media/releases/2022/s0901-covid-19-booster.html

On January 4, 2021, at about the time of the initial vaccine rollout, the BOP published "COVID-19 Vaccine Guidance."  *See COVID-19 Vaccine Guidance*, FEDERAL BUREAU OF PRISONS CLINICAL GUIDANCE (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. It provided that administration of the COVID-19 vaccine (Pfizer and Moderna) would "align with [recommendations of] the Centers for Disease Control and Prevention."  *Id.* at 4.  Its plan was for prisoners at heightened risk to receive priority for the vaccine.  *Id.* at 6.  The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, *Federal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, FORBES (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f.  Much has changed since that time.

As of April 19, 2023, the BOP had 145,196 federal inmates and approximately 36,000 staff.  And, by that date, the BOP had administered 349,798 vaccine doses to staff and inmates. *See* BUREAU OF PRISONS,  https://www.bop.gov/coronavirus/ (last updated Apr. 19, 2023).[7]

Also as of May 11, 2023, approximately 69% of the total U.S. population has completed their primary vaccination series (i.e., one dose of a single-dose vaccine or two doses on different days), including 32% of people from ages 5 to 11, 61% of people from ages 12 to 17, 66% of people from ages 18 to 24, 72% of people from ages 25 to 49, 83% of people from ages 50 to 54, and 94% of people ages 65 and up.  *See COVID-19 Vaccinations in the United States*, CTRS. FOR DISEASE CONTROL,  https://covid.cdc.gov/covid-data-tracker/#vaccinations_vacc-people-fully-percent-pop5 (final update May 11, 2023); *Trends in Demographic Characteristics of People Receiving COVID-19 Vaccinations in the United States*, CTRS. FOR DISEASE CONTROL, https://covid.cdc.gov/covid-data-tracker/#vaccination-demographics-trends (final update May 11, 2023).  Moreover, approximately 54.5 million Americans have received a "booster" vaccine dose, which the CDC recommends for all persons age 5 and older.  *See id*.; *COVID-19 Vaccine Booster Shots*,  CTRS.  FOR  DISEASE  CONTROL,  https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html (last updated May 23, 2023).

### D.

The number of COVID-19 cases continues to fluctuate.  For a brief time in the Fall of 2021, the country enjoyed a reduction of COVID-19 cases.  *See* David Leonhardt, *Covid Cases Keep Falling*, N.Y. TIMES, Oct. 27, 2021, https://www.nytimes.com/2021/10/26/briefing/covid-cases-falling-delta.html ("The number of new daily COVID-19 cases has plunged since peaking on

---

[7] This webpage appears to no longer be in service. However, the BOP continues to update individual facility statistics at https://www.bop.gov/coronavirus/covid19_statistics.html.

Sept.1. Almost as encouraging as the magnitude of the decline is its breadth: Cases have been declining in every region.").  But, the trend was short-lived, due to the spread of the Delta variant and then the Omicron variant.

The Delta variant was thought to be more virulent than earlier strains of COVID-19. *See Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (updated Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous variants");  *see also* Jon Kamp & Brianna Abbott, *Delta Variant Recedes Across the United States*, WALL ST. J., Nov. 1, 2021, https://www.wsj.com/articles/delta-surge-of-covid-19-recedes-leaving-winter-challenge-ahead-11635672600 ("The Delta-fueled wave continues to take a serious toll, but the seven day average in reported deaths has dropped to about 1,400 a day from daily averages above 2,000 in late September, Johns Hopkins data show."); Apoorva Mandavilli, *What to Know About Breakthrough Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021), https://www.nytimes.com/article/covid-breakthrough-delta-variant.html (noting that, as of August 14, 2021, "[i]nfections have spiked to the highest levels in six months").

After the Delta variant, the Omicron variant emerged, sparking concern because it was highly contagious. *See Omicron Variant: What You Need to Know*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last updated Dec. 13, 2021).  Indeed, Omicron contributed to a substantial and serious spike in COVID-19 cases. *See, e.g.*, Aya Elamroussi, *"Omicron surge is 'unlike anything we've ever seen,' expert says,"* CNN (Dec. 31, 2021), https://www.cnn.com/2021/12/30/health/us-coronavirus-thursday/index.html.  But, the number of COVID-19 cases again declined.  *See, e.g.*, Anabelle Timsit, *U.S. coronavirus cases are dropping. Other countries are breaking records.*, WASH. POST

(Feb. 7, 2022), https://www.washingtonpost.com/nation/2022/02/07/covid-omicron-variant-live-updates/#link-ZMG6VYX45VH5RAD3JX3IN3JF3Y.   And, the country began to return to normalcy.

The country then experienced another surge in COVID-19 cases.  *See, e.g.*, Anne Barnard, *Covid Cases Are Rising Again. How Cautious Should We Be?*, N.Y. TIMES (Apr. 7, 2022), https://www.nytimes.com/2022/04/07/nyregion/covid-cases-are-rising-again-how-cautious-should-we-be.html.  In particular, in the spring of 2022 a new variant of the virus began "spreading rapidly" and soon became "the dominant form of the virus . . . ."  *See* Isabella Grullón Paz, *A new subvariant is spreading rapidly in the United States*, N.Y. TIMES (May 9, 2022), https://www.nytimes.com/live/2022/05/04/world/covid-19-mandates-vaccine-cases.   As of July 2022, the BA.5 variant of COVID-19, an "offshoot of the Omicron variant," was "spreading quickly," buttressed by an increased ability to overcome "some of the immune defenses acquired by vaccinated people, or those infected by earlier variants."  Ed Yong, *Is BA.5 the 'Reinfection Wave'?*, THE ATLANTIC (July 11, 2022), https://www.theatlantic.com/health/archive/2022/07/ba5-omicron-variant-covid-surge-immunity-reinfection/670485/.   But, the variant then seemed to subside.  *See COVID Data Tracker: Variant Proportions*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://covid.cdc.gov/covid-data-tracker/#variant-proportions (last updated Apr. 15, 2023).

At this point, COVID-19 has, in a sense, become a fact of life.  *See* Mitch Smith and Julie Bosman, *Covid Deaths Surge Across a Weary America as a Once-Hopeful Summer Ends*, N.Y. TIMES, Sept. 5, 2021,  https://www.nytimes.com/2021/09/05/us/covid-surge-united-states.html ("[T]he coronavirus is going to remain a fact of American life for the foreseeable future.").  In other words, we are in "a more endemic phase of this crisis . . . ."  *See* District of Maryland

Standing Order 2022-05, Misc. No. 00-308 (filed Dec. 14, 2022).  Indeed, in an interview in September 2022 on the CBS television show "60 Minutes", President Biden claimed that the pandemic is "over" in the United States.  Alexander Tin, *Biden says Covid-19 pandemic is "over" in U.S.*, CBS NEWS (Sept. 19, 2022).  He stated: "The pandemic is over.  We still have a problem with COVID.  We're still doing a lotta work on it . . . .  But the pandemic is over."  *Id.*

On February 10, 2023, President Biden provided notice of his intent to terminate the COVID-19 national emergency, which went into effect on May 11, 2023.  *Termination of COVID-19 National Emergency*, ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS (Apr. 3, 2023).  And, Congress passed a joint resolution (H.J. Res. 7) to end the national emergency.  *Id.*

In any event, it appears that "virus metrics have stabilized."  Standing Order 2022-05.  Indeed, as of March 10, 2023, Johns Hopkins University stopped collecting data as to the virus.  *See* COVID-19 Dashboard, *supra*, https://bit.ly/2WD4XU9. And, as Chief Judge Bredar of this Court has noted, in consultation with this court's epidemiologist, the virus patterns have changed, with the virus's severity decreasing as "the population has gained some level of immunity from vaccinations and prior infections."  *Id.*  Put another way, the coronavirus may be here to stay, but the acute nature of the crisis has certainly abated.

With respect to the BOP, it has reported that, as of May 1, 2023, 188 federal inmates, out of a total inmate population of 145,473, and 28 BOP staff, out of some 36,000 staff members, currently test positive for COVID-19.  Moreover, 44,057 inmates and 15,272 staff have recovered from the COVID-19 virus.  In addition, 317 inmates and seven staff members have died from the virus.  The BOP has completed 128,639 COVID-19 tests.  *See* https://www.bop.gov/coronavirus/, *supra*.

As to Fort Dix FCI, where the defendant is now imprisoned, the BOP reported that as of

June 6, 2023, out of a total of 3,780 inmates, zero inmates and zero staff members currently test positive, two inmates and zero staff members have died of COVID-19, and 1,226 inmates and 134 staff have recovered at the facility. In addition, at Fort Dix FCI, 277 staff members and 3,372 inmates have been inoculated with the vaccine. *See* https://www.bop.gov/coronavirus/covid19_statistics.html; BUREAU OF PRISONS, https://www.bop.gov/locations/institutions/ftd/ (last accessed June 7, 2023).

### V. Motion for Compassionate Release

Williams argues that extraordinary and compelling circumstances warrant compassionate release. As noted, he relies on the COVID-19 pandemic in combination with his medical issues and conditions of confinement ECF 1322.

Williams's medical records indicate that he suffers from asthma. *See* ECF 1345-3 at 29, 50. Williams's medical records also show that he is a former smoker. *Id.* at 18. However, Williams's substance abuse disorders appear to be in remission, and his heart condition is currently listed as a "resolved" medical problem. *Id.* at 51, 60.

With regard to asthma, the CDC is clear that people with "moderate-to-severe or uncontrolled asthma are more likely to be hospitalized from COVID-19." People with Moderate to Severe Asthma, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html (last updated Apr. 7, 2022). However, it is unclear, based on the record, if Williams's asthma qualifies as "moderate to severe." Williams's medical records indicate that he has been prescribed Albuterol to use up to four times a day, as needed. ECF 1345-3 at 4.

Rulings as to asthma as an extraordinary and compelling reason are mixed. Judge Grimm of this Court has noted: "This Court and others have found that the standard of extraordinary and

compelling reasons was met during the COVID-19 pandemic where a defendant had a risk of serious complications from COVID-19 based on asthma and other medical conditions....However, in some cases this Court and others have found that mild asthma alone did not a [sic] constitute extraordinary and compelling reasons for release." *United States v. Jennings*, PWG-13-046, 2020 WL 4748462, at *4 (D. Md. Aug. 17, 2020) (collecting cases).

Similarly, another court has remarked: "Because the CDC lists moderate to severe asthma as a condition that can increase the risk of severe illness caused by COVID-19, many courts have distinguished between petitioners with mild/moderate asthma to severe asthma when deciding whether the condition constitutes a compelling and extraordinary circumstance justifying compassionate release....Moderate asthma occurs 'where the individual suffers from daily symptoms, experiences nighttime awakenings more than once a week, uses an Albuterol rescue inhaler on a daily basis, and experiences some limitation of normal activities.'" *United States v. Garcia*, 538 F. Supp. 3d 226, 229 (D. Mass. 2021) (internal citations omitted). *See also, e.g., United States v. Armstrong*, RDB-19-357, 2021 WL 2806226, at *3 (D. Md. July 6, 2021) (citing CDC guidance, declining to find extraordinary and compelling reasons based on asthma adequately managed by prescriptions); *United States v. Malone*, CCB-13-307, 2021 WL 252559, at *1 (D. Md. Jan. 26, 2021) (asthma alone not sufficient grounds for compassionate release); *United States v. Daniels*, Crim. No. 15-127, 2020 WL 4674125, at *3 (E.D. Pa. Aug. 12, 2020) (recognizing that moderate to severe asthma could constitute an extraordinary and compelling reason for compassionate release, but concluding it was not warranted based on medical records indicating asthma is under control defendant was instructed to use Albuterol only to prevent attack, but not daily).

Although Williams is permitted to use Albuterol up to four times a day, there is no evidence that he actually uses an Albuterol inhaler on a daily basis. Nor does the medical record reflect limitations on defendant's normal activities. *See* ECF 1345-3.  To the contrary, defendant's medical records indicate the following: "He denies any nighttime awakenings, audible wheezing, and excessive sputum production. He has no problems when exercising. He has never been intubated nor any recent er visits or hospitalizations for asthma exacerbations. asthma appears to be controlled." *Id.* at 10. Accordingly, Williams's asthma would seem to fall in the mild category, and thus on its own the condition would not support a finding of extraordinary and compelling reasons for compassionate release.

Additionally, a person is considered overweight if his BMI is 25 or more, and a person is obese if his BMI is 30 or more. As of November 23, 2021, Williams's BMI was 29.5. ECF 1345-3 at 11. Courts have found that obesity, or even borderline obesity, can serve as a basis for compassionate release, particularly when coupled with other chronic medical conditions.  *See United States v. Readus*, No. 16-20827-1, 2020 WL 2572280, at *3 (E.D. Mich. May 21, 2020) ("Courts have found that the combination of prediabetes and obesity have been sufficient to warrant release"); *see also, e.g.*, *United States v. Smith*, 538 F. Supp. 3d 990, 995 (E.D. Cal. 2021) ("Many courts have also found that people who have a body mass index within the ranges defined as 'overweight' or 'obese' are at greater risk of severe COVID-19."); *Williams*, 2020 WL 3073320, at *1 (finding defendant with a BMI of 32.5 was obese and qualified for compassionate release given COVID-19); *United States v. Hilow*, No. 15-170-JD, 2020 WL 2851086, at *4 (D. N.H. June 2, 2020) (involving asthma, migraines, hypertension, high cholesterol, prediabetes, and borderline obesity); *United States v. Zuckerman*, 451 F. Supp. 3d 329, 335 (S.D.N.Y. 2020) (finding defendant's age, diabetes, hypertension, and obesity satisfied an extraordinary and compelling

reason); *United States v. Ullings*, 1:10-CR-00406, 2020 WL 2394096, at *4 (N.D. Ga. May 12, 2020) (finding defendant's age, hypertension, and obesity satisfied an extraordinary and compelling reason); *United States v. Foreman*, 3:19-CR-62 (VAB), 2020 WL 2315908, at *4 (D. Conn. May 11, 2020) (finding defendant's age, hypertension, and obesity satisfied an extraordinary and compelling reason); *United States v. Quintero*, 08-CR-6007L, 2020 WL 2175171, at *1 (W.D.N.Y. May 6, 2020) (finding defendant's diabetes, compromised immune system, obesity, and hypertension satisfied an extraordinary and compelling reason); *United States v. Dawson*, No. 18-40085, 2020 WL 1812270, at *7 (D. Kan. Apr. 9, 2020) (granting compassionate release based on a defendant's obesity).

Moreover, as noted earlier, the "risk of severe COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*. Numerous judges in this district and elsewhere have found extraordinary and compelling circumstances for defendants with multiple chronic medical conditions. *See, e.g.*, *United States v. Azianbidji*, PWG-17-253, 2021 WL 307416, at *1 (D. Md. Jan. 29, 2021) (defendant with hyperlipidemia, hypertension, and obesity); *United States v. White*, CCB-09-369, 2020 WL 3960830, at *2-3 (D. Md. July 10, 2020) (defendant with neutropenia, hyperlipidemia, hypertension, heart disease, chronic kidney disease, and obesity); *United States v. Oaks*, RDB-17-288, 2020 WL 3433326, at *3 (D. Md. June 23, 2020) (defendant with Type II diabetes, hypertension, asthma, anemia, hyperlipidemia, and arthritis); *Hilow*, 2020 WL 2851086, at *4 (involving asthma, migraines, hypertension, high cholesterol, prediabetes, and borderline obesity); *United States v. Gutman*, RDB-19-0069, 2020 WL 24674345, at *2 (D. Md. May 13, 2020) (finding defendant's age of 56 years, multiple sclerosis, and hypertension satisfied extraordinary and compelling reason); *United States v. Quintero*, 458 F. Supp. 3d 130, 132 (W.D.N.Y. 2020)

(finding defendant's diabetes, compromised immune system, obesity, and hypertension constituted an extraordinary and compelling reason); *United States v. Coles*, No. 00-cr-20051, 2020 WL 1976296, at \*7 (C.D. Ill. Apr. 24, 2020) (granting compassionate release to defendant with hypertension, prediabetes, prostate issues, bladder issues, and a dental infection); *United States v. Zukerman*, 451 F. Supp. 3d 329, 336 (S.D.N.Y. 2020) (concluding that defendant's diabetes, hypertension, obesity, and age satisfied extraordinary and compelling reason); *United States v. Rodriguez*, 451 F. Supp. 3d 392, 401 (E.D. Pa. 2020) (finding defendant's hypertension and diabetes qualified as extraordinary and compelling reason).

Of import here, Williams's medical records show that he declined the COVID-19 vaccine - first on October 5, 2021, and again on January 19, 2022. *See* ECF 1345-3 at 56. Williams's decision to refuse the COVID-19 vaccine substantially weakens his argument for compassionate release based on his medical conditions.

The CDC has emphasized that "COVID-19 vaccines are effective at helping protect against severe disease and death from variants of the virus that causes COVID-19 currently circulating, including the Delta variant," and that "[w]idespread vaccination is a critical tool to help stop the pandemic." *Key Things to Know about COVID-19 Vaccines*, Ctrs. for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/keythingstoknow.html (updated July 20, 2022). Indeed, "vaccines are the best way to protect [an individual] and others against COVID-19." Dr. Francis Collins, *Latest on Omicron Variant and COVID-19 Vaccine Protection*, NIH Director's Blog (Dec. 14, 2021), https://directorsblog.nih.gov/2021/12/14/the-latest-on-the-omicron-variant-and-vaccine-protection/. Moreover, the vaccines are central to preventing dangerous mutations. *See, e.g.*, *Another Reason To Get Vaccinated? To Stop Variants*

*From Developing*, HENRY FORD HEALTH SYS. (Sept. 27, 2021), https://www.henryford.com/blog/2021/09/get-vaccinated-to-stop-variants.

To be sure, "[a] prisoner has the right to refuse vaccination . . . ." *United States v. Allen*, KM-18-216, 2023 WL 314351, at *7 (D.N.J. Jan. 19, 2023). But, "courts have rightly cast a skeptical eye on prisoners who refuse vaccination while simultaneously claiming that only release from prison will relieve the danger of COVID-19." *Id.* And, a growing number of district court judges and appellate courts across the country, have reasoned that a prisoner's refusal to obtain a COVID-19 vaccine significantly undermines the prisoner's claim that his susceptibility to the effects of COVID-19 constitutes grounds for compassionate release.

In *United States v. Broadfield*, 5 F.4th 801, 803 (7th Cir. 2021), the Seventh Circuit said: "[A] prisoner who remains at elevated risk because he has declined to be vaccinated cannot plausibly characterize that risk as an 'extraordinary and compelling' justification for release. The risk is self-incurred." And, in *United States v. Lemons*, 15 F.4th 747, 751 (6th Cir. 2021), the Sixth Circuit said: "[W]ith access to the vaccine, an inmate largely faces the same risk from COVID-19 as those who are not incarcerated."

Judge Gallagher of this Court has observed: "Courts now widely recognize that a refusal to take preventative measures to protect oneself from COVID-19 undermines any assertion that the risk of viral infection constitutes an extraordinary and compelling reason justifying release . . . . Any decision to the contrary would create a perverse incentive in favor of declining the vaccine, undermining the BOP's efforts to protect its incarcerated population and to allow prison operations to return to some degree of normalcy in the coming months." *United States v. Ayres*, SAG-04-004, 2021 WL 2352322, at *2 (D. Md. June 9, 2021) (collecting cases); *see also United States v. Ealy,* JPJ-00-104, 2023 WL 2176574, at *3 (W.D. Va. Feb. 23, 2023); *United*

34

*States v. Jones,* JCD-17-22, 2022 WL 17472232, at *3 (E.D. N.C. Dec. 6, 2022); *United States v. Poulson*, RCY-18-49, 2022 WL 3970198, at *3 (E.D. Va. Aug. 31, 2022); *United States v. Dempsey*, TNM-19-368, 2021 WL 2073350, at *3–4 (D.D.C. May 24, 2021) (reasoning similarly); *United States v. Smith*, SAG-20-47, 2021 WL 1733457, at *2 (D. Md. May 3, 2021); *accord United States v. Simpson*, SAG-16-0398, 2021 WL 2260379, at *2 (D. Md. June 3, 2021); *United States v. Cain*, JAW-16-00103, 2021 WL 2269974, at *7 (D. Me. June 3, 2021); *United States v. Brice*, SAG-07-0261, 2021 WL 1926713, at *3 (D. Md. May 13, 2021); *United States v. Ortiz*, JFL-18-00264, 2021 WL 1422816, at *4 (E.D. Pa. Apr. 15, 2021); *United States v. Piles*, JDB-19-292-5, 2021 WL 1198019, at *3 (D.D.C. Mar. 30, 2021) (collecting cases); *United States v. Siegel*, TDC-03-0393, 2021 WL 962491, at *2 (D. Md. Mar. 15, 2021); *United States v. Reynoso*, 525 F. Supp. 3d 253, 255 (D. Mass. 2021).

"At the end of the day, district judges are not epidemiologists." *United States v. Sherrod*, 19-20139, 2021 WL 3473236, at *5 (E.D. Mich. Aug. 6, 2021). But, it is noteworthy that Williams previously contracted COVID-19 and, despite his medical conditions, it apparently was a mild case. *See* ECF 1345 at 31; ECF 1358 at 9. Nevertheless, to the extent the government claims that Williams's previous bout with COVID-19 generally cuts against release, the argument is not persuasive. As the CDC has stated, "[a]n individual can be reinfected multiple times" and "[r]einfections are most often mild, but ***severe illness can occur***." *See What is COVID-19 Reinfection?*, CTRS. FOR DISEASE CONTROL & PREVENTION (Mar. 15, 2023), https://www.cdc.gov/coronavirus/2019-ncov/your-health/reinfection.html#:~:text=Reinfections%20may%20occur%20during%20the,increase%20when%20new%20variants%20emerge.

Williams filed his Motion in January 2022.  Based on the government's opposition, defendant is aware of the government's contention that his refusal to get vaccinated militates against his claim for compassionate release on the basis of his medical conditions.  In all this time, defendant has not advised the Court that he has since been vaccinated.

Defendant's decision whether to forego the COVID-19 vaccine is his to make.  That said, I need not ignore the decision.  Given defendant's refusal to get vaccinated, I decline to find that defendant's medical conditions constitute a basis for compassionate release.

However, even assuming, *arguendo*, that defendant satisfies the extraordinary and compelling prong of § 3582, he is not entitled to compassionate release, for the reasons discussed below.

## B.

The coronavirus is not "tantamount to a 'get out of jail free' card."  *United States v. Williams*, PWG-13-544, 2020 WL 1434130, at *3 (D. Md. Mar. 24, 2020) (Day, M.J.).  Even when a court finds extraordinary and compelling reasons for compassionate release, relief is warranted under 18 U.S.C. § 3582(c)(1)(A) only if appropriate in light of factors set forth in 18 U.S.C. § 3553(a).  *See High*, 997 F.3d at 186; *see also United States v. Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam).  These factors include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.  *High*, 997 F.3d at 186.

Courts place significant weight on a defendant's post-sentencing conduct, because it "provides the most up-to-date picture of [his] 'history and characteristics.'" *Pepper v. United States*, 562 U.S. 476, 492 (2011) (citing 18 U.S.C. § 3553(a)(1)). The court must "at least weigh the [defendant's] conduct in the years since the initial sentencing." *McDonald*, 986 F.3d at 412; *see Lancaster*, 997 F.3d at 175 ("And in considering the § 3553(a) factors, the court can take into account a defendant's conduct after his initial sentencing."); *United States v. Rudisill*, 834 Fed. App'x 827, 829 (4th Cir. 2021) (finding district judge abused his discretion in denying motion under the First Step Act without addressing defendant's post-sentencing conduct). A defendant's behavior while in BOP custody is an important indicator of whether he remains a danger to the community. *See* 18 U.S.C. § 3582(c)(1)(A)(ii).

Williams has engaged in rehabilitative efforts, which the court should consider. *United States v. Randall*, 837 Fed. App'x 1008, 1009 (4th Cir. 2021) ("[A] district court must provide an individualized explanation for denying a sentence reduction motion under the First Step Act when the defendant presents evidence of his post-sentencing rehabilitation."); *United States v. Martin,* 916 F.3d 389, 397 (4th Cir. 2019) (requiring an "individualized explanation" as to rehabilitative efforts). Significantly, defendant's efforts include completion of four courses while in BOP custody, and enrollment in a 500-hour janitorial apprenticeship program. ECF 1358 at 10. And, at least through the time of the parties' submissions, Williams has had no disciplinary issues. *Id.* Relatedly, Williams avers that he has "absolutely no history of violence." ECF 64 at 8. Moreover, Williams has provided the Court with a release plan (ECF 1323-2), as well as multiple character letters. ECF 1330; ECF 1332; ECF 1342.

The government has not proffered evidence that undermines Williams's rehabilitation or good conduct while incarcerated. Williams's rehabilitation is "a significant factor" in determining

37

whether a sentence reduction is warranted. *United States v. Ogun*, ___F.Supp.3d___, 2023 WL 2207114, at *10 (E.D. Va. Feb. 24, 2023). But, rehabilitation alone does not warrant a defendant's immediate release. *Davis*, 2022 WL 127900, at *1.

The government expresses concern about the danger Williams would pose to the community, due to the seriousness of his offense, as well as his pattern of recidivism. ECF 1345 at 34-35. This is a valid concern.  During the investigation regarding the case, law enforcement officials searched defendant's vehicles, residence, properties, and bank accounts, and they recovered a  firearm, significant quantities of cocaine, heroin, cocaine base, and fentanyl, and approximately $472,000 in drug proceeds. ECF 1137, ¶ 9.

Furthermore, defendant was convicted of nine crimes from 1995 to 2006, including twice for assault, as well as disorderly conduct and telephonic threats. *See* ECF 1240, ¶¶  28-36. Moreover, in 2008 he was convicted of a federal charge for conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine, for which he was sentenced to 10 years of incarceration and 5 years of supervised release. *Id.* ¶ 37. Yet, his prior federal sentence did not deter Williams from committing a second drug-related federal offense, and while on supervised release.

In my view, defendant's early release would not promote respect for the law.  Williams's Plea Agreement was entered in June 2021 and he was sentenced in September 2021. Simply put, this is not the "grievous case[]" warranting compassionate relief at this time.  *McCoy*, 981 F.3d at 287.

## VI. Conclusion

For the reasons set forth above, I shall deny defendant's Motion (ECF 1322), without prejudice. I shall also deny defendant's motion for counsel (ECF 1326), without prejudice.

An Order follows, consistent with this Memorandum Opinion.


Date:   July 11, 2023                                    _____/s/_____
                                                        Ellen Lipton Hollander
                                                        United States District Judge